## TOWLE v. HAMMOND.

(Circuit Court of Appeals, Sixth Circuit. February 6, 1900.)

No. 660.

1. PARTNERSHIP—PURCHASE OF CO-PARTNER'S INTEREST IN FIRM.

A partner's purchase of the interest of another partner in a firm does not inure to the benefit of a third partner, as a matter of law or equity, even though the purchaser acquired the equity of redemption in the interest after the failure of the selling partner.

2. SAME—SALARY OF PARTNER—WEIGHT OF EVIDENCE.

A partner testified that when the firm was formed it was agreed that H. and I., two of the partners, were to receive no salary, but that P. and the witness were to be paid a salary. The books kept by I. showed that from the organization of the firm H. received a salary, and that I. did not. P. never made any objection. *Held*, that the unsupported evidence of the witness is insufficient to establish his claim as to H.'s salary.

3. SAME—PARTNERSHIP ACCOUNTS.

The mere failure of a witness to recall the receipt of money on a certain date 20 years before, where it was conceded that he did receive money from the same source at some time, will not impeach a charge against a partner in the partnership accounts, for an advance to the witness, where the account in every other respect is entirely accurate.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

This is an appeal by Marcus M. Towle from a decree of the circuit court dismissing his bill in equity against the personal representatives of George H. Hammond, deceased. The prayer of the bill was for an accounting by the administrators of the estate of George H. Hammond to Towle for profits received by Hammond in the business of slaughtering cattle and transporting meat by refrigerator cars from what is now Hammond, Ind., to the Eastern markets and to Europe, in which business, the bill averred, Towle and Hammond had been associated together as partners, with others, from the year 1869 to 1877, and thereafter as sole partners until 1881, and subsequently as fellow stockholders in a corporation organized to conduct the same business. The bill, in effect, charged that Hammond had control of the business, kept the books under his supervision at Detroit, and that Towle, whose part of the business was done at Hammond, knew nothing of the books or of the profits earned, and that, by misrepresentation of material facts, Hammond had induced Towle to accept as his share of the capital stock of the corporation organized in October, 1881, one-fifth thereof, when he was entitled, by reason of his actual ownership in the business at that time, to one-third of said capital stock. It was further averred in the bill that, in the partnership books kept under Hammond's direction, Towle had been charged in his personal account with items amounting to more than $100,000, which were properly chargeable to the business of the firm and corporation, and that such false charges had inured to the benefit of Hammond. The bill further charged that, under the direction of Hammond, money had been paid out of the firm funds as loans to different persons, and charged to Towle's personal account, but that when these loans had been repaid Hammond had appropriated them to his own use, and had not credited them to Towle.

The administrators of Hammond answered, admitting the business relationship between Hammond and Towle as averred in the bill, but denying all charges of fraud. The answer further pleaded the bar of the statute of limitations, both that of six years, and also that of two years for the presentation of claims against the estate of deceased persons. The bill, in anticipation of a plea of laches, had set forth, in considerable detail, why complainant had not before discovered the fraud; the chief ground being that Hammond managed the business at Detroit, while Towle superintended the slaughtering of cattle at Hammond, and rarely, if ever, visited Detroit, and never examined the

books; and, further, that Hammond concealed the evidence of the fraud from Towle, and that never until a suit was brought against Hammond by one Davis for the settlement for royalties upon a patent on refrigerator cars was Towle advised of the actual facts upon which he now seeks a recovery.

The following is a short history of the transactions involved in this controversy:

In September, 1869, Towle, the complainant, and one Plummer, who were butchers in Detroit, and who had in a small way been transporting slaughtered beef to the Boston market for sale, associated themselves with George H. Hammond, the defendant's intestate, and one Caleb Ives, for the purpose of carrying on the business of slaughtering cattle and selling the meat in the Eastern markets. Prior to this time, Hammond and Ives had entered into a contract with Samuel H. Davis and David W. Davis and Thomas B. Rayl, by which the Davises and Rayl, who owned a patent for refrigerator cars, gave a license to Hammond and Ives to use said patent for transporting meat, for the consideration that Hammond and Ives should build cars according to the patent, and conduct the business of slaughtering cattle and transporting the meat, after it had been dressed, to the Eastern market, and should pay the owners of the patent one-sixth of the profits of the business. This contract was made in July, 1869, and the partnership between Hammond and Ives and Plummer and Towle was entered into in September of the same year. Plummer and Towle did not have any interest in the patent except as it was used in the business in which they were partners. To the original partnership, Hammond contributed $4,000; Ives, $4,000; Plummer, $2,000; and Towle, $2,000. The contract of partnership was oral, but under it Hammond and Ives were each to receive one-third of the profits, and Plummer and Towle each one-sixth. Land was purchased in the name of all of them on the Calumet river, on the state line between Indiana and Ill'nois, and slaughter houses were there erected. To Plummer was assigned the duty of buying cattle in Chicago and elsewhere; to Towle, that of superintending the slaughtering and dressing of the cattle at Hammond and the shipping of the same; to Ives, that of keeping the books at Detroit; and to Hammond, the general management of the business at Detroit and elsewhere. The business was fairly profitable from 1869 until the death of Plummer, in 1873. After the death of Plummer, Hammond, Ives, and Towle met Plummer's representatives in Detroit, and Plummer's interest in the business was purchased for $25,000. In the partnership which succeeded Plummer's death, the profit and loss account upon the books which were thereafter kept by M. W. Allen, brother-in-law of Ives, who was called into the business to represent Ives' interest, showed that Hammond had seven-fifteenths interest, Ives five-fifteenths, and Towle three-fifteenths. The bill avers that the division should have been, under the agreement, two-fifths to Hammond, two-fifths to Ives, and one-fifth to Towle. There were no written articles of partnership, and the agreement, if there was one expressed, was oral. The original partnership had been called Hammond, Plummer & Co. Upon Plummer's death, the partnership then formed was known as George H. Hammond & Co. Hammond, Ives, and Towle carried on the business under this name together until March, 1877. Ives had been engaged in a good many other business ventures, and, becoming involved in the summer of 1876, induced Hammond, for his accommodation, to indorse notes aggregating in amount something over $66,000. To secure Hammond against loss on these indorsements, he executed to him two instruments, the first of which authorized Hammond to apply, to the payment of any of these notes which he might be called upon to pay, Ives' share of the profits in the business, and the second of which, executed a few days later, was a chattel mortgage of Ives' interest in the partnership, whereby Ives purported to convey title and to vest in possession of Hammond his share in the firm of George H. Hammond & Co. The condition of the mortgage was that Ives should take up and pay his notes upon which Hammond was accommodation indorser, and save Hammond harmless from liability thereon. Notwithstanding the assistance which Hammond thus gave Ives, on March 11, 1877, he was obliged to make a common-law assignment for the benefit of creditors, and 10 days later filed a petition in bankruptcy in the United States district court for the Eastern district of Michigan. Immediately after Ives' assignment

and failure, the business was continued, with Hammond and Towle as the only partners. New books and new accounts were opened. At the close of the year 1877, the credit to Ives on the books was $82,600, and on the 1st of January, 1878, this credit was transferred from Ives to Hammond's personal account, and the account of Ives was closed. Upon Ives' failure in March, Hammond telegraphed Towle to meet him on the train as it passed through Hammond to Chicago. This Towle did, and Hammond then informed Towle that Ives had failed, and the situation was discussed. Towle testifies that Hammond said to him that the business could go on without Ives; that Towle inquired what became of Ives' interest, and that Hammond replied, "We take it." In February, 1878, Ives' assignee in bankruptcy filed a bill in equity against Hammond and Towle for an accounting by them, as partners, to him for the share of Ives. In this bill, Ives' credit upon the books of the firm, as of January 1, 1878, is set forth, and the claim is made that the partners in possession ought also to account for the good will and other property of the old firm. A joint answer was filed in the name of Hammond and Towle, in which was set forth at considerable length the terms between Ives and Hammond, and the agreement and chattel mortgage by which Hammond was put in possession of Ives' interest in the firm, and Hammond's right thereafter to hold such interest until the payment of the notes, which were produced, and he was obliged to take up as indorser. Hammond further filed a cross bill against Towle and Ives, in which he set up the mortgage prayed, and dissolution of the firm, and a sale of Ives' interest therein to satisfy the mortgage. Towle denies all knowledge of this proceeding, and it is admitted that his name was signed to the joint answer of himself and Hammond, by Hammond. The cause remained pending until June, 1880, when Hammond settled with the assignee in bankruptcy by an agreement, which was approved by the district judge, whereby Ives' interest in the firm of George H. Hammond & Co. was assigned by the assignee to Hammond upon payment of $5,000 in addition to the release of Ives' estate from any further liability upon the notes which Hammond had taken up. Hammond took up the notes by checks of George H. Hammond & Co., which checks were charged against his personal account on the books of the company. The same was true of the $5,000 payment, whereby he obtained the equity of redemption in the share of Ives. The profit and loss account in the new firm of George H. Hammond & Co. (for the firm name was not changed by Ives' withdrawal) showed a division of profits for the first time in August, 1880, and in that division Hammond received four-fifths and Towle one-fifth. Another division of profits was made in January, 1881, in the same ratio, and another one in July, 1881. In October, 1881, Hammond, at one of his frequent visits to Towle at the city of Hammond, presented to Towle articles of incorporation for the organization of a Michigan company, to carry on the business of George H. Hammond & Co., for his signature and acknowledgment of the same. These articles showed that Towle's subscription to the capital stock was for nearly one-fifth thereof, and Hammond's for nearly four-fifths, with a small residue to two other stockholders.

Carroll Towle, a brother of the complainant, testifies to the conversation between Hammond and Towle at this time as follows: "Mr Hammond pulled a bunch of papers out of his pocket, and looked around at Mr. Towle. He looked at it, and said, 'How much is my interest in that business?' Hammond said, 'Twenty per cent.' He says, 'How's that?' He says, 'How much do you expect?' Mr. Towle says, 'What became of Mr. Ives' interest?' He says, 'I bought that.' Towle says, 'Who from?' He said, 'From Mr. Ives.' He said, 'Did you pay for it with your own money or the company's money?' He said, 'I paid for it with my own money.' Mr. Towle said, 'That's funny I should not know that perhaps for two or three years.' He took the paper, and walked around the room with it, and seemed to be disappointed. Finally he walked up to the desk, and signed it, and handed it back to Mr. Hammond." This statement of Carroll Towle is corroborated by the complainant and his wife. Two years after the original testimony of the complainant was taken the complainant was recalled, and testified that in that conversation Hammond told him that he bought the Ives interest before Ives failed. No other witness testifies to this. Thereafter the corporation was duly formed, Towle received one-fifth of the shares of stock and Hammond four-fifths, and the business

was carried on most successfully. Towle subsequently sold out his interest in the stock. Hammond died in 1886, and this bill was filed in January, 1892.

The charges of the bill that Towle had been debited with a large number of items, aggregating $100,000, which should have been charged to the firm, were not sustained by the evidence. It appeared that Ives, as the bookkeeping member of the firm, devised a plan by which all the expenses of the Hammond plant, together with some purchases of cattle, and bills which were ordered paid by Towle as having been incurred by his authority, were charged to his personal account as the money was paid out, and at the end of the month he transmitted a statement of his expenditures to the Detroit office, upon which statement he was given credit on the other side of his personal account for the same items. The statement forwarded by him included the pay roll, and it was entered upon the books in his account in a lump sum as pay-roll account. This peculiar system of keeping the books of the business was made clear, not only by the son of M. W. Allen, the bookkeeper, by whom most of these facts were recorded, and who succeeded his father as bookkeeper, but also by the discovery of a book kept at Hammond, in which many of the entries were made in Towle's own handwriting. With respect to the amounts which the bill averred that Hammond had loaned for Towle and charged to his account, and then, upon repayment of the same, had appropriated to his own use, without giving Towle credit therefor, it appeared fully upon the cross-examination of the expert bookkeeper, called by the complainant, that the loans and interest upon repayment had all been properly credited to Towle. So clear was this made that complainant's counsel withdrew all claims based on wrongful charges to the personal account of Towle except as to three items. One was a charge of $5.200 for the payments purporting to have been made to P. Myrick. Another was a charge for $20,000, stated to be for an overcredit of $100,000 by refrigerator cars. The same proportionate charge was made against Ives in his account and against Hammond in his account, according to their holdings in the firm, to wit, seven-fifteenths of $100,000 against Hammond, five-fifteenths against Ives, and three-fifteenths against Towle. Further objection was made to the fact that Hammond was credited with salary during all the partnership, the amount varying from time to time. It is claimed on behalf of Towle that Hammond was to receive no salary, though Plummer and Towle were to receive it.

Towle was called to the stand to testify in the case by the complainant. Objection was made to his competency as a witness to transactions between him and Hammond, both under the statute of the United States (section 858, Rev. St.) and the statutes of Michigan. After the complainant closed his case, the defendant called Towle to the stand, and examined him further. The questions put were all relevant on cross-examination upon subjects testified to by him when called by the complainant.

The bill charged that Hammond had paid the notes indorsed by him for the accommodation of Ives out of the funds of George H. Hammond & Co., and that he had paid the $5,000, with which Ives' share had been purchased, from the same source. The averment of the bill as to Hammond's alleged misrepresentation to Towle, on the faith of which Towle was induced to accept one-fifth of the capital stock of the corporation in 1881 as his proper share thereof, is as follows: "Sixteenth. And your orator further shows that the co-partnership of George H. Hammond & Company, above referred to, was as aforesaid, in the year A. D. 1881, merged into a corporation, under the laws of the state of Michigan, under the name and style of 'George H. Hammond & Company,' with a capital stock of one million dollars; that the whole of said capital stock was paid for with the assets and good will of the aforesaid co-partnership of George H. Hammond & Company; that no new capital was put into said corporation; that your orator, being the owner of one-third of the assets and good will of said co-partnership, was lawfully entitled to receive one-third of said capital stock, or three hundred and thirty-three thousand three hundred and thirty-three and one-third dollars' worth of it; that both at the time of the allotment of said capital stock between your orator and the said George H. Hammond, and at other times prior thereto, the said George H. Hammond wickedly, fraudulently, falsely, deceitfully, and knowingly, with the intention to cheat, wrong, and defraud your orator, said and represented to your orator,

and to other persons who communicated the fact of such representations before that time to your orator, that he, the said George H. Hammond, bought the aforesaid interest of the said Caleb Ives in and to the assets of the said co-partnership of George H. Hammond & Company at its full cash value, and that he paid for the same out of his separate estate, and not out of the undivided assets of the said co-partnership of George H. Hammond & Company, and at the time of said allotment he, the said George H. Hammond, was the separate and sole owner of that interest, and that the interest of your orator in the said co-partnership of George H. Hammond & Company was a one-fifth interest, and not a one-third interest; and your orator, confiding in the said George H. Hammond, and believing that the aforesaid statements of the said George H. Hammond, both to your orator and to the said other persons as aforesaid, were true, and believing that the said George H. Hammond had purchased the aforesaid interest of the said Caleb Ives with his own separate money, and not with the money of the said co-partnership of George H. Hammond & Company, and that the said George H. Hammond was the sole owner of the said Caleb Ives' interest, consented to take, and took, one-fifth, or two hundred thousand dollars' worth, of said stock, and the said George H. Hammond took four-fifths, or eight hundred thousand dollars' worth, of it."

Upon the pleadings and proof the circuit court dismissed the bill.

John B. Corliss, Alfred Russell, and W. B. Coy, for appellant.

Elliott G. Stevenson and Leo M. Butzel, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts as above). Serious questions as to the admissibility of material evidence upon which the complainant relies, as to the statute of limitations, and as to laches were considered by the circuit court, and decided adversely to the complainant. We do not find it necessary to consider any of them, for the reason that upon the record, and all the evidence as it is presented to the court, this seems to be a very plain case for the defendant. The main controversy turns on the terms of the contract of partnership entered into between Hammond and Towle in the spring of 1877, after Ives, by reason of his failure, assignment, and bankruptcy, caused a dissolution of the partnership then existing between him, Hammond, and Towle. Towle testifies that he met Hammond upon the train between Chicago and Detroit by appointment; that Hammond told him that they would be able to continue the business without Ives; and that, when Towle inquired what became of Ives' interest, Hammond replied, "We take it." Hammond then had a chattel mortgage upon Ives' interest for $66,000, and Ives' interest did not at that time on the books amount to more than that sum. On the 1st of January, 1878, the amount to Ives' credit in the partnership was $82,000, and Hammond then directed that Ives' interest should be transferred to his credit. Hammond had meantime paid out of his own pocket the $66,000, with interest, due from him as an accommodation indorser for Ives. Then ensued the litigation which in June, 1880, resulted in an assignment by the assignee in bankruptcy of Ives' interest to Hammond. In August of 1880, in January of 1881, in July of 1881, balances were struck and profits divided between Hammond and Towle on a basis of four-fifths interest in Hammond and one-fifth interest in Towle. In October, 1881, Hammond invited Towle

to subscribe to the corporation which was to succeed the firm, and to take therein one-fifth of the capital stock. Towle demurred to this, on the supposition that he had a larger interest, and inquired what became of Ives' interest. Hammond replied that he has purchased Ives' interest with his own money. Towle, on the faith of this statement, consented to receive a one-fifth interest in the new corporation. If Hammond said to Towle, in 1877, that he and Towle would buy Ives' interest, and Hammond did then buy Ives' interest, and take it to himself, Hammond would hold Ives' interest for the benefit of both of them. But Towle's acquiescence in Hammond's statement in 1881, that he had bought Ives' interest and paid for it with his own money, and Towle's acceptance of one-fifth interest in reliance upon that statement, and his failure to object to the new arrangement for more than ten years, and until nearly six years after Hammond's death, make it very clear to our minds that Hammond did not tell Towle, at the time that Towle met Hammond on the train, that they would both take Ives' interest. Towle's conduct is utterly at variance with such a state of fact. The bill makes no such averment, and Towle did not so testify until his cross-examination. The statement is not corroborated by any direct evidence as to the interview between the two men, because no one else appears to have been present. It is attempted to corroborate this, however, by alleged statements made by Hammond at other times,—one testified to by a witness (Mason) as made in June, 1880, and another by a witness (Davis) as made in September, 1880. These witnesses say that Hammond, in effect, told them that Towle then had one-third of the business, because he and Towle had bought Ives out. Mason was a former employé of Hammond's, whose services Hammond had dispensed with because of a new arrangement he was obliged to make with the railroad companies, and who subsequently became a confidential agent of Towle. Davis was engaged in litigation with Hammond, and seems to have been one of those instigating Towle to bring the present suit. The statements were made at a time when it is altogether unlikely that Hammond could or would have made them, for they were made after Ives' share had been assigned to Hammond under an order of the court, and they were made at a time when the profits were being divided, one-fifth to Towle and four-fifths to Hammond. The evidence relied on was of casual conversations, held 10 years before the testimony was given, by witnesses who were naturally hostile to Hammond and friendly to the suit against him. The truth is, moreover, that the evidence of the complainant himself does not seem to the court to be worthy of the utmost credit; for in this very bill, filed in 1892, he permitted himself, on his oath, to charge his dead partner with false entries against him of more than $100,000, and with the appropriation and embezzlement of other sums, when it is made satisfactorily to appear that he was fully aware of the system of bookkeeping under which such charges were properly made, and were duly offset by proper credits on the other side of the ledger. Not only were these averments made in the bill by complainant, but his early testimony tended to support them, and it was not until a rigid

cross-examination and a production of the account book, a large part of which was kept by the complainant himself, and which showed the falsity of these averments, that their unfounded character clearly appeared, and complainant's counsel properly felt obliged to withdraw them. A party who puts himself in such a position before the court cannot expect that his testimony on other material points in the case will be accorded great weight, especially when it is so utterly at variance with his subsequent conduct. Eliminating, therefore, from our consideration, the conversation which Towle reports between himself and Hammond on the train in 1887, the only other evidence as to the terms of that partnership is the conversation which took place when Towle consented to receive one-fifth interest in the corporation. If there had been no agreement or understanding theretofore, this was a ratification of the terms which Hammond claimed, and must be regarded as settling the ratable interests of the two in that firm, unless Towle was induced to agree to it by misrepresentation. Complainant's witnesses state that Hammond said to Towle that he had bought Ives' share from Ives, and that he paid for it with his own money. The bill avers that this was false, and that he paid for it out of the money of George H. Hammoud & Co. The books show conclusively that while, in making the payments to Ives, he used the checks of the firm, as he did in all his personal business, they were charged to him on the books of the firm as his individual payments. The statement of Hammond, therefore, that he paid for Ives' interest with his own money was true. This is the only alleged misrepresentation averred in the bill, and it is difficult to understand how, in the absence of amendment, complainant can rely on any other.

Still, let us consider the circumstance resting on the evidence of Towle alone, that Hammond, in his statement to Towle, fixed the purchase of Ives' interest as at a time before Ives failed. When Towle was first a witness he did not report Hammond as fixing any time. It was not until two years later, when it became clear that Hammond had paid for Ives' interest with his own money, that Towle recalled this part of the conversation. Such evidence, in view of the recklessness of Towle in his other testimony already alluded to, would be a very slender thread on which to hang a decree setting aside transactions of 20 years' standing. But let us assume that it is true. Literally, Hammond did not buy Ives' interest before he failed, but he did take a chattel mortgage on his interest to secure an amount equal to the entire sum then to the credit of Ives on the books of the firm, and as all he thereafter paid to secure the equity of redemption was $5,000, which was less than the increase in Ives' book credit between the execution of the mortgage and the closing of Ives' account, it would not have been unnatural for him to regard his real purchase as made when the chattel mortgage was given. Strictly speaking, of course, he had but a defeasible title before Ives' failure; but, as it ripened into an absolute one afterwards, a reference to his purchase as of the time when he took the defeasible title was a mistake entirely consistent with good faith. He did, in fact, transfer the account of Ives to himself on the books of the

firm two years before he really acquired the equity of redemption. We can be quite sure that the distinction between the statement said to have been made to Towle and the facts was not sufficiently material to have made any change in Towle's conduct. Towle does not say that it would have made any difference, and there is nothing else in the case to support such a conclusion.

The material legal distinction between a purchase before and after Ives' failure is pressed upon the court. The contention is that while it is true that one of three partners may buy the interest of another, and take an assignment of the same to himself, without acting as a trustee or agent for the third partner, and without holding the assigned share for his benefit, before the dissolution of the partnership, he may not do so afterwards, and, if he does do so afterwards, he holds as trustee for the third partner. No case has been cited in which such a distinction is announced, and if it existed there is nothing to show that either Hammond or Towle regarded it as important or likely to influence Towle in accepting or rejecting a one-fifth interest. The difference between the purchase before and after dissolution is said to grow out of the consequences of the dissolution. When one of several partners becomes bankrupt, it is said that the assignee of the bankrupt has no right to the possession of the assets of the partnership, and has only a claim for an accounting against the solvent members of the firm, and that thereafter the solvent members of the firm occupy a trust relation towards each other in dealing with the representative of the bankrupt partner. The concession by the complainant, that one partner may buy the interest of another without liability to other partners to account for the profit of the purchase, is well justified by the cases following: Cassels v. Stewart, 6 App. Cas. 64; Lobdell v. Baldwin, 93 Mich. 569, 53 N. W. 730; Karrick v. Hannaman, 168 U. S. 334, 18 Sup. Ct. 135, 42 L. Ed. 484; Monroe v. Hamilton, 60 Ala. 232; Edens v. Williams, 36 Ill. 254; Frederick v. Cooper, 3 Iowa, 171; Dimon v. Hazard, 32 N. Y. 65; Reese v. Bradford, 13 Ala. 837. Upon dissolution by reason of the bankruptcy of one of the partners, the solvent partners have the right to settle the firm business, collect the assets, pay the debts, and distribute the surplus. Amsinck v. Bean, 22 Wall. 395, 403, 22 L. Ed. 801; Ex parte Owen, 13 Q. B. Div. 113; Lindl. Partn. 671; Bates, Partn. § 754, and cases cited. They, of course, are under obligation to pay the full share of the bankrupt to his assignee. The character of the respective shares to be distributed is not changed by the fact that the settlement is intrusted to the solvent partners. The title of the latter is not different from that of the assignee by reason of the bankruptcy. The change effected is only in the person to administer. The solvent partners do not occupy any different relation as between themselves and the assignee and his share than they did when it was owned by the assignor. The extent of the interest of each is exactly that which it was before dissolution. Neither of the solvent partners is a trustee for the other in the division of the surplus between them and the assignee. They are settling up the estate for the firm's benefit, and not for the benefit of the two

solvent partners as against the assignee. After the surplus is accumulated and fixed, the shares are known. It is immaterial to each partner who owns the other shares, so long as he receives his rightful share of the surplus. If one of the solvent partners acquires the share of the bankrupt's assignee, this neither increases nor diminishes the share of the other solvent partner, because it cannot affect at all the amount of the surplus to be divided. Each partner occupies to the other a fiduciary relation in collecting the assets and paying the debts of the partnership and accumulating the surplus fund for distribution; but, when the fund is accumulated and fixed, it cannot be material to each partner who the distributees shall be, provided always he secure his rightful share. If, therefore, one of the solvent partners buys the interest of the bankrupt partner from his assignee, he does nothing which prejudices the other solvent partner. It will neither increase nor cut down the amount which such partner will receive in the distribution. It therefore follows that Hammond's purchase of Ives' interest in the old firm did not inure to the benefit of Towle as a matter of equity or law, even though he acquired the equity of redemption in it after Ives failed. The representation, therefore, that he bought it before Ives failed, even if made, was immaterial, both in fact and law.

We conclude that there was no material misrepresentation upon which the acquiescence of Towle in the division of interests between him and Hammond in the partnership of George H. Hammond & Co. from 1877 to 1881 was secured. We have proceeded on the assumption made by counsel for complainant that Towle had no knowledge whatever of the entries upon the books,—no knowledge whatever of the basis upon which the actual division of profits was made during the partnership. Counsel argued that Towle was an unlettered man, and not a man of business, and was completely under the control of Hammond. The evidence shows that Towle was engaged in large business ventures outside of the business of Hammond & Co. He was engaged in the sale of general merchandise, and in the lumber business; he was president of the First National Bank of Hammond; he was in the real-estate business; he was mayor of Hammond; trustee of the township; had a large interest in a distillery, in a spring-manufacturing business, in a carriage factory, in a steel-making plant, in a foundry, and in the oil business. He kept such books as were kept at Hammond, and seems to have been quite successful in the management of all his ventures. This would seem strongly to refute the claim that he was a mere puppet in the hands of Hammond.

The bill avers, and counsel claim, that the division of interests after the death of Plummer between Hammond, Ives, and Towle was two-fifths to Hammond, two-fifths to Ives, and one-fifth to Towle. If we understand it, this attempt to increase the interest of Ives, beyond what the books showed him to have had between 1873 and 1877, is to increase the amount for which Hammond was accountable to Towle by increasing the amount of the Ives interest in the business and the profits therefrom. We must presume that Ives knew what his interest in the business was after Plummer retired.

Allen, Ives' brother-in-law and representative in the business, kept the books, and from 1873 to 1877 there were divisions of the profits made as often as once a year, and in that division Hammond was credited with seven-fifteenths, Ives with five-fifteenths, and Towle with three-fifteenths. When Ives' assignee came to file his bill for · an accounting against the solvent partners, he averred that Ives' interest was only five-fifteenths, and this was admitted by Hammond. Ives was an active business man, who lived in Michigan, and may be presumed to have known what the books contained. He never claimed more than one-third interest, and it would seem absurd for Towle now to attempt to establish that his interest was larger than Ives himself claimed it to be.

Towle seeks to recover from Hammond's estate his distributive share of the amount drawn by Hammond as salary. He testifies that, when the firm of Hammond, Plummer & Co. was formed, it was agreed that Hammond and Ives were to receive no salary, but that Plummer and Towle were to be paid one. The books kept by Ives show that from the organization of the firm Hammond received a salary, and Ives did not. Certainly, then, Ives understood the agreement to be that Hammond should draw a salary; and we may presume that Plummer knew what the books showed, and acquiesced in Hammond's salary. Without proof to support it, we cannot assume that Plummer was so densely ignorant of the partnership affairs as Towle testifies that he himself was. On Towle's unsupported statement, inconsistent as it is with the books and with Ives' and Plummer's conduct, we cannot hold that his claim as to Hammond's salary has been sustained.

As to the amount charged to the complainant by payment to Myrick of $5,200, we have no doubt that this is offset by a credit to complainant of the same amount. There is every probability that the credit was included in a larger lump credit denominated in the books the "pay-roll account." Upon cross-examination, the complainant, in effect, admitted that this was the probability. Myrick's failure to recall the receipt of the money at this date, more than two decades before, when it is conceded that he did receive money to make purchases of cattle at some time, is not a successful impeachment of the account, which in every other respect is entirely accurate.

The charge against the defendant of $20,000 because of an over-credit of $100,000 on refrigerator cars is not fully explained, but, as the books show that the other partners, Hammond and Ives, were each charged their proper share of the $100,000, it certainly worked no injustice as between the partners.

Upon the merits of the case, upon all the evidence, competent and incompetent, we are convinced that Hammond dealt justly with Towle, and was the chief instrumentality in laying the foundation of complainant's fortune. The decree dismissing the bill is affirmed.